IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 19, 2022

## MARICO VALES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 16-01967        J. Robert Carter, Jr., Judge
_____

## No. W2021-01076-CCA-R3-PC
_____

A Shelby County jury convicted the Petitioner, Marico Vales, of first degree felony murder and especially aggravated robbery. The Petitioner appealed, and this court affirmed the convictions and sentence. *See State v. Marico Vales*, No. W2018-00424-CCA-R3-CD, 2019 WL 328436 at *1, (Tenn. Crim. App., at Jackson, Jan. 23, 2019), *perm. app. denied* (Tenn. May 20, 2019). The Petitioner then filed a post-conviction petition, claiming he received the ineffective assistance of counsel and, following a hearing, the post-conviction court denied relief. On appeal, the Petitioner maintains that Counsel was ineffective because he failed to object to inadmissible evidence and evidence admitted without the proper foundation. After review, we affirm the post-conviction court's judgement.
inser

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., joined. JOHN EVERETT WILLIAMS, P.J., not participating.[1]

Joshua N. Corman, Memphis, Tennessee, for the appellant, Marico Vales.

Herbert H. Slatery III, Attorney General and Reporter; Lindsay Haynes Sisco, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Neil Umsted, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

---

[1] The Honorable John Everett Williams died September 2, 2022, and did not participate in this opinion. We acknowledge his faithful service to this Court.

The Petitioner was indicted, along with two co-defendants, Antonio Jones and Christian Hall, for felony murder and especially aggravated robbery. At trial, the Petitioner was convicted as charged and the trial court imposed an effective life sentence. The Petitioner appealed his convictions, asserting that the evidence was insufficient. This court summarized the facts presented at trial as follows:

The [Petitioner]'s convictions relate to the June 11, 2015 homicide of Khaled Khaya, who was fatally shot when working at Zorro Market (the market) in Shelby County. At the trial, Hasan Wadi testified that he owned the market at the time of the incident, that he opened the market at 8:00 a.m. on June 11, that he left at 8:30 p.m., and that the victim worked the remainder of the evening shift. Mr. Wadi said that he and the victim were friends and that the day of the shooting was the victim's second day of work. Mr. Wadi said that he called the market around 10:45 p.m., that the victim did not answer, that he returned to the market, and that he saw police cars when he arrived.

Mr. Wadi testified that he provided the police with a surveillance recording that showed various angles from inside the market around the time of the shooting, and a portion of the recording was played for the jury. In the recording, at approximately 9:53 p.m., a male employee, whom Mr. Wadi identified as the victim, stood behind the cash register at the front counter assisting an African-American male customer, who wore a dark-colored shirt and had arm tattoos. The customer was later identified as the [Petitioner]. The [Petitioner] purchased items and paid with cash. After the victim provided the [Petitioner] with change, the victim retrieved and provided the [Petitioner] with a small pad of paper on which the [Petitioner] wrote and returned to the victim. The two men conversed, the victim made entries on the cash register, and the [Petitioner] provided a card, which the victim swiped on a machine beside the cash register. The men conversed again, and the victim swiped the card again. The two men conversed a third time, and the victim returned the card and provided the [Petitioner] with a small piece of paper. At approximately 9:56 p.m., the [Petitioner] left the counter. The victim and the [Petitioner] were separated by glass that contained a small opening.

Mr. Wadi identified photographs of the market, described the general layout, and noted "bullet proof glass" separated employees and customers at the front counter. He identified photographs of the cash register and of the machine used for debit, credit, and EBT food stamp transactions. A portion of the surveillance recording that showed only the victim behind the counter

2

was played for the jury. In the recording, the victim, at approximately 9:59 p.m., left the front counter and entered a door, which Mr. Wadi said led to the "pizza section" at which employees prepared pizzas after a customer ordered and paid. A glass window beside the door allowed for slight visibility into the pizza preparation area. At 10:02 p.m., the victim returned to the front counter and removed what Mr. Wadi described as latex gloves. Mr. Wadi said that the gloves were worn when preparing pizzas. He said that the pizza order depicted in the recording was paid for with an EBT card. Mr. Wadi stated that EBT cards were used regularly at the market, that each card was associated with an identification number, and that he provided the police with the number associated with the last EBT transaction for a pizza purchase.

Mr. Wadi testified that when preparing the pizza, the victim would have placed toppings on a frozen pizza crust and inserted the pizza into an oven that moved the pizza on a conveyor belt. He said that after about five minutes, the pizza came out of the oven baked fully and that it was impossible to burn a pizza using this procedure and oven.

A portion of the surveillance recording that showed the victim and customers at the front counter was played for the jury. In the recording, at approximately 10:24 p.m., the victim assisted two African-American men. The [Petitioner] and a man wearing a light-colored shirt stood at the front counter. The victim left the front counter away from the camera's view but returned with what appeared to be scratch-off lottery tickets and handed them to the [Petitioner]. At approximately 10:26 p.m., the man wearing the light-colored shirt appeared to be talking on a cell phone. The men bought several additional items and paid with a plastic card, which the victim swiped on the machine beside the cash register. The victim placed the items into a bag and provided the man wearing the light-colored shirt with a receipt at 10:27 p.m. The men left the front counter.

In the recording, the victim assisted various customers and periodically walked away from the camera's view in the direction of the pizza preparation area and lottery ticket dispenser. At approximately 10:31 p.m., the [Petitioner] returned to the front counter and provided the victim with scratch-off lottery tickets. The victim and the [Petitioner] walked out of the camera's view and toward the pizza preparation area and the lottery ticket dispenser. The [Petitioner] and the victim returned to the front counter, and the victim provided the [Petitioner] with scratch-off lottery tickets. At approximately 10:32 p.m., the [Petitioner] left the counter. The victim

3

assisted other customers, and at approximately 10:34 p.m., the [Petitioner] returned to the front counter with scratch-off lottery tickets. The [Petitioner] provided the victim with the tickets, and both the [Petitioner] and the victim walked away from the camera's view toward the pizza preparation area and the lottery ticket dispenser. The [Petitioner] and the victim returned to the front counter, the victim provided the [Petitioner] with scratch-off lottery tickets, and the [Petitioner] scratched the tickets at the counter. The [Petitioner] provided the tickets to the victim, who walked away from the camera's view, and the victim provided the [Petitioner] with additional tickets when the victim returned. The [Petitioner] scratched the tickets at the counter. At approximately 10:38 p.m., the [Petitioner] walked out of the camera's view toward the pizza preparation area, and a shadow moved in the opposite direction across the camera's view a couple of seconds later.

At approximately 10:40 p.m., an African-American man wearing an orange hat, who was later identified as Antonio Jones, appeared momentarily at the front counter and walked away from the camera's view. Mr. Jones returned to the counter, jumped on the counter, leaned through the opening in the bullet-resistant glass, and reached toward the cash register. Mr. Jones jumped off the counter into the employee area, fidgeted with the cash register, which did not open, and moved out of the camera's view. At 10:41 p.m., an African-American man, who was later identified as Christian Hall and wore a dark shirt and a light-colored cloth around his neck, approached the front counter. Mr. Jones returned to the cash register, fidgeted with the cash register, jumped across the counter toward the exit, and both men moved out of the camera's view.

A portion of the surveillance recording that showed the victim behind the front counter was played for the jury. In the recording, at approximately 10:23 p.m., the man wearing the light-colored shirt briefly walked to the pizza preparation area, while the victim remained at the front counter. The victim returned to the pizza preparation area, and the [Petitioner] walked to the pizza preparation area. The [Petitioner] walked toward the front counter, and at 10:24 p.m., the victim returned to the front counter. Multiple times the victim retrieved scratch-off lottery tickets and returned to the front counter. At 10:38 p.m., the victim returned to the pizza preparation area, and the [Petitioner] stood in the pizza preparation area across from the victim. The [Petitioner] walked away from the pizza preparation area and out of the camera's view seconds later. At 10:40 p.m., Mr. Hall approached the pizza preparation area, extended his arm toward the victim, and entered the preparation area. Mr. Jones jumped on the front counter and entered the

4

employee area, took money from the cash register located near the lottery ticket dispenser, and jumped across the counter and away from the camera's view.

Mr. Wadi identified a photograph of the pizza station, which was received as an exhibit. The photograph depicted the pizza oven and showed that no bullet-resistant glass separated an employee from a customer. Mr. Wadi said that the market usually stopped serving pizza around 9:00 or 9:30 p.m. but that an employee would prepare a pizza for a customer known to the employee after this time. He said that the store closed at 11:00 p.m.

A portion of the surveillance recording that showed the employee area from an area closer to the lottery ticket dispenser was played for the jury. In the recording, the victim walked away from the camera's view toward the pizza preparation area. At approximately 10:38 p.m., the [Petitioner] walked from the front counter toward the pizza preparation area and away from the camera's view. Seconds later, the [Petitioner] walked away from the pizza preparation area, past the front counter, and out of the camera's view. At 10:40 p.m., Mr. Hall and Mr. Jones walked toward the pizza preparation area and away from the camera's view. Mr. Jones ran toward the front counter, jumped on the counter, and attempted to open the cash register located to the right of the opening in the bullet-resistant glass. Mr. Jones walked to the second cash register, removed the money, walked to and fidgeted with the first cash register, and jumped across the counter toward the exit.

Mr. Wadi testified that approximately $ 8,000 was taken from the store.

On cross-examination, Mr. Wadi testified that it took approximately five to six minutes to bake a pizza and that the conveyor belt speed and the temperature could not be adjusted. After examining the summary transaction printout, he clarified that the receipt was a summary of the day's credit card transactions, that the receipt did not reflect any EBT transactions, and that a different machine was used for EBT transactions. He clarified that he did not call the market on the night of the incident but that he called the victim's cell phone between 10:45 and 11:00 p.m. Mr. Wadi said that he did not usually call the market after he left but that he wanted to check on the victim, who was a new employee. Mr. Wadi said that he intended to return to the store to assist the victim at closing and that he called the victim on his way to the market.

5

Mr. Wadi testified that the surveillance recording did not reflect a busy evening at the market. He said that the victim's wearing latex gloves in the recording indicated the victim was preparing a pizza. Mr. Wadi said that he did not perform an audit to determine the amount of money taken and that $ 8,000 was an estimate. He said that three cash registers were inside the market, that one was used for lottery purchases, that another was used for check cashing and money orders, and that the third was used for all credit card, EBT, and non-lottery cash purchases. Mr. Wadi said that the money was taken from the register used for cashing checks and contained the most money.

Mr. Wadi testified that the victim had previous experience working at a convenience store and making pizzas, that the victim knew not to send a pizza through the oven more than once, and that sending a pizza through the oven twice would burn it. He said surveillance cameras were outside the market but that the cameras belonged to the owner of the shopping center in which the market was located.

Tom Pae testified that he managed the shopping center. He said that he provided sheriff's deputies with recordings of the parking lots. Mr. Pae identified the recording of the front parking lot, a portion of which was played for the jury.

In the recording, at approximately 9:46 p.m., a dark-colored car drove into the parking lot and parked partially within view of the camera. The car parked in such a manner that only the passenger-side door and rear of the car were visible. The driver's side was not visible. At approximately 9:52 p.m., the [Petitioner] walked from the building toward the dark-colored car, around the rear of the car, and out of the camera's view. Seconds later, the dark-colored car moved slightly, as though someone sat inside the car, before leaving the parking lot.

Mr. Pae identified the recording of the rear parking lot, a portion of which was played for the jury. However, the record does not reflect which portion of the recording was played. Mr. Pae testified that the recording showed two people behind a dumpster walking toward the market. Mr. Pae stated that the recording dates and times were correct.

Corsenna Newbern testified that the [Petitioner], whom she referred to as Rico, was the father of her two children and that on June 11, 2015, he drove her home from work. She said that the [Petitioner] did not stay at

6

home, that he drove to the market to a buy pizza, and that he bought pizza at the market frequently. She recalled that she and the [Petitioner] bought pizza at the market two or three times per week. She said that she and the [Petitioner] paid for the pizzas with her EBT food stamp card and that, at about 9:00 p.m., she gave the [Petitioner] her EBT card to purchase the pizza. She said that he returned home around midnight or 1:00 a.m. without a pizza but that he had cheeseburgers and fries from Wendy's for the children.

Ms. Newbern testified that Mr. Jones, whom she referred to as Montana, and the [Petitioner] were friends. She said that Mr. Jones lived in the same neighborhood as she and the [Petitioner] and that the [Petitioner] and Mr. Jones borrowed each other's cars and "hung out" daily. She said that Brandon Thompson, who was Mr. Jones's brother, and the [Petitioner] were friends. She recalled that the [Petitioner] drove her green Honda on the night of the incident. She said that she learned later that the [Petitioner] had been at the market where someone had been shot. She said that although the [Petitioner] told her the pizza had been burned, the market had never burned a pizza previously.

Ms. Newbern was shown a portion of the surveillance camera from inside the market. The customer who wore the dark-colored shirt and had arm tattoos was depicted in the recording. Ms. Newbern identified the man as the [Petitioner] based upon the tattoos.

Ms. Newbern identified a photograph of the [Petitioner] and Mr. Jones and testified that she did not know when the photograph was taken. She identified a photograph of Mr. Jones, Mr. Thompson, Mr. Jones's young son, and a man unknown to Ms. Newbern. She identified a third photograph of Mr. Jones, Mr. Thompson, Mr. Jones's young son, and the unknown man and stated that although the photograph was taken at Chuck E. Cheese's, she had never attended a party there with the people in the photograph. Ms. Newbern said that Mr. Jones and Mr. Thompson attended her son's birthday party a couple of days after the June 11 incident. She identified a photograph of Ms. Newbern and the [Petitioner]'s green Honda and of the [Petitioner]'s silver car and said the photograph was taken at the [Petitioner]'s mother's home. She stated that the [Petitioner] drove the green Honda on the night of the incident and changed his cell phone number after the incident.

On cross-examination, Ms. Newbern testified that the Honda was titled in her name and that she paid for it. She said that, at the time of the incident, she lived with the [Petitioner]'s mother and that the [Petitioner]

7

"stay[ed] ... on and off" at his mother's home.  Ms. Newbern did not know when the photograph of the [Petitioner] and Mr. Jones at the [Petitioner]'s mother's home was taken.  She said that the [Petitioner] did not return home with extra money on the night of the incident.  She denied that she saw the [Petitioner] with any money in the days and weeks after the incident and said that the [Petitioner] made no expensive purchases.

United States Department of Agriculture Agent Lynn Bracey testified that around June 18, 2015, Shelby County Sheriff's Detective Steve Bierbrodt contacted him regarding the identity of the owner of an EBT debit card.  Agent Bracey stated that the card used for a June 11, 2015 transaction in the amount of $ 12.66 belonged to Ms. Newbern.

On cross-examination, Agent Bracey testified that EBT transactions were time stamped and that the "Alert System" contained EBT transaction data, including information related to each store that accepted EBT cards as a form of payment, each card number, and the amount of each purchase.  He said that the contract between the State of Tennessee and the third party processor required the time stamp data to be accurate.  Agent Bracey reviewed the total transaction summary receipt from the market previously identified by Mr. Wadi and testified that the receipt did not reflect any specific EBT transaction.

Julius Miller testified that he went to the market on June 11, 2015, although he could not recall the time.  He said that he did not see anyone inside the market when he approached the front counter to pay for a beverage and that he returned the beverage, left the store, and called the police because "something didn't feel right."  He said that a "young guy" arrived at the market, that they entered the store, and that they saw the victim was deceased. Mr. Miller said that he saw blood and ran out of the store and that he called the police and waited for them to arrive.

Mr. Miller did not recall seeing a green Honda in the parking lot and testified that nobody drove through the parking lot when he and the man waited for the police to arrive.  He said that he did not see the [Petitioner] at the market and that he did not smell a burned pizza while inside the market.

Shelby County Sheriff's Deputy Richard McKinney testified that dispatch received a call regarding this incident, that he responded to the scene, and that he saw the victim lying on the floor between a food

preparation table and a freezer. He secured the scene and contacted a detective.

Shelby County Sheriff's Detective Steve Bierbrodt testified that he responded to the scene and that he reviewed the surveillance recordings. He identified photographs depicting three cartridge casings, a bullet hole on a wall sign, a trajectory rod going through the bullet hole on the sign and wall, the victim lying on the floor between the "pizza area" and the freezer, an open cash register containing only coins, and footprints inside and outside the market. Detective Bierbrodt identified a photograph of a pizza order form reflecting the name Rico. Detective Bierbrodt stated that the sign and drywall were removed in order to obtain the bullet projectile.

Detective Bierbrodt testified that he reviewed the surveillance recording from inside the market, that he observed a person returning to the front counter multiple times, and that the person ordered a pizza and paid for the order with what the detective believed was a debit card. He said that he showed the recording to Mr. Wadi, that Mr. Wadi identified the EBT machine as the machine used to pay for the pizza, and that the detective obtained the card information from the Department of Agriculture.

Detective Bierbrodt testified that on June 18, 2015, he spoke with Ms. Newbern, who stated that she sent the [Petitioner] to the market to purchase a pizza on the night of the incident. Detective Bierbrodt stated that he interviewed the [Petitioner], who initially said that he and Mr. Thompson went to the market to order a pizza but that he did not "get the pizza" because it had been burned. Detective Bierbrodt said that, upon further questioning, the [Petitioner] stated that as he left the parking lot, he saw Mr. Hall and Mr. Jones. The recording of the interview was played for the jury.

In the recording, the detectives stated that the [Petitioner] requested to speak with them and asked the [Petitioner] what occurred. The [Petitioner] thought that Mr. Jones and Mr. Jones's stepbrother, whom the [Petitioner] later identified as Mr. Hall, "did this." The [Petitioner] denied seeing Mr. Hall since the [Petitioner] saw him "run out of the store that night" but admitted seeing Mr. Jones. The [Petitioner] denied that Mr. Jones spoke about the robbery or shooting. The [Petitioner] admitted talking on the telephone since the [Petitioner]'s arrest about "what was going on." The detective said the surveillance recording showed that the [Petitioner] "paused" when he "backed out" of the parking lot and asked the [Petitioner] who he saw. The [Petitioner] said that he saw Mr. Jones and Mr. Hall, who

9

he referred to as "Champ." The [Petitioner] denied knowing about the robbery and shooting and said he was at the market to purchase a pizza. He denied being a "lookout." The [Petitioner] said that Mr. Jones lived within walking distance of the market.

In the recording, the detective drew a map of the market and the surrounding area. The detective indicated that the [Petitioner]'s car was parked along the right side of the building when leaving the market and stated that two men ran out of the building, around the right of the building, and behind the building. The [Petitioner] identified on the map the nearby apartment complex at which Mr. Jones lived. The [Petitioner] said that "they" did not need a car but that Mr. Hall drove a dark blue Lexus. The [Petitioner] said that he saw Mr. Jones and Mr. Hall when they entered and left the market. The [Petitioner] denied staying in the parking lot to find out what they were doing and said he was going to look for marijuana because the victim told him the pizza would be ready in approximately fifteen minutes.

In the recording, the [Petitioner] stated that Mr. Jones wore an orange hat at the time of the incident and that Mr. Jones did not talk to him about the robbery. The [Petitioner] said that he saw Mr. Jones once after the robbery, that Mr. Jones said he had $ 1,000 for an apartment, and that the [Petitioner] never saw any money. The [Petitioner] said that before his arrest, he had a Cricket Cellular phone and a Trac phone. The [Petitioner] identified a photograph of Mr. Hall and stated that any guns would have been at Mr. Hall's home. When asked if he saw Mr. Jones and Mr. Hall carrying anything when they ran out of the market, the [Petitioner] said he saw "a little bag" but could not determine what was inside.

In the recording, the [Petitioner] implicated Mr. Jones in two additional robbery-related homicides. Although the [Petitioner] thought Mr. Jones was the shooter in the present case, the detective said the surveillance recording showed that Mr. Hall shot the victim. The detective prepared a photograph lineup and presented it to the [Petitioner]. The [Petitioner] identified one person whom the [Petitioner] saw enter and leave the market at the time of the incident. As the detective prepared a second photograph lineup, another detective asked the [Petitioner] what happened on the night of the shooting. The detective told the [Petitioner] that the deputies would help the [Petitioner] as long as the [Petitioner] was honest. The detective stated Mr. Jones told the deputies that Mr. Jones and the [Petitioner] "were together that night," and the [Petitioner] denied the allegation and said he did

10

not have a phone to communicate with Mr. Jones.  When asked how Mr. Jones and Mr. Hall came to be at the market at the same time as the [Petitioner], the [Petitioner] said that "they had to have been waiting."  The [Petitioner] stated that he and Mr. Thompson were in the [Petitioner]'s car on the night of the incident.

Detective Bierbrodt testified that he obtained a search warrant for the [Petitioner]'s cell phone and that the photograph lineups referenced in the recording included photographs of Mr. Hall and Mr. Jones.  Detective Bierbrodt said that the [Petitioner] identified Mr. Jones in one lineup and Mr. Hall in another.  Detective Bierbrodt stated that he interviewed Mr. Hall, Mr. Thompson, and Mr. Jones, whom the detective said were all brothers and the [Petitioner]'s friends.  Detective Bierbrodt stated that Mr. Thompson and Mr. Jones each consented to a search of their respective cell phones.  Detective Bierbrodt stated that Mr. Hall broke his cell phone when he was taken into police custody, preventing a search of the phone.

Detective Bierbrodt identified Mr. Thompson in the surveillance recording depicting the front parking lot of the market and stated that Mr. Thompson appeared to be talking on a cell phone and getting out of a vehicle. Detective Bierbrodt reviewed the photograph previously identified by Ms. Newbern as depicting Mr. Jones, Mr. Jones' young son, Mr. Thompson, and a man unknown to Ms. Newbern.  Detective Bierbrodt stated that the photograph depicted Mr. Jones, Mr. Thompson, and Mr. Hall and that it had been taken between March and May 2015.  Detective Bierbrodt reviewed the photograph taken at Chuck E. Cheese's and stated that it showed Mr. Thompson, Mr. Jones, and Mr. Hall.  Detective Bierbrodt reviewed the photographs showing Ms. Newbern's green Honda and the [Petitioner] and Mr. Jones standing on a driveway. Detective Bierbrodt stated that all of the photographs were obtained from Mr. Jones's cell phone.  Detective Bierbrodt identified a photograph of what he described as a "large sum[ ] of money in small denominations" and stated that the photograph was obtained from Mr. Jones's phone and was taken after the robbery.

On cross-examination, Detective Bierbrodt testified that the time reflected on the surveillance recording from inside the market was a few minutes fast and that he noted the discrepancy in his supplemental police report.  He stated that he did not know the exact time the EBT card was used.

Detective Bierbrodt testified that the [Petitioner] was cooperative and calm, that he did not implicate himself in the robbery, and that he did not

11

state he knew where the firearm and money could have been located. Detective Bierbrodt said that nobody he interviewed stated the [Petitioner] had a role in the robbery and shooting. Detective Bierbrodt agreed that the surveillance recording of the front parking lot showed Mr. Thompson getting out of the passenger side of the green Honda and that Mr. Thompson told the detective what the [Petitioner] said about the pizza and why the men were at the market. Detective Bierbrodt agreed that Mr. Thompson reported seeing Mr. Hall and Mr. Jones running inside the market and that Mr. Thompson, Mr. Hall, and Mr. Jones were brothers. Detective Bierbrodt did not recall whether Mr. Thompson was inside the market. Detective Bierbrodt said that neither the proceeds nor the firearm from the robbery were found inside Ms. Newbern's green Honda but that fingerprints were found inside the car, although he was unsure to whom the fingerprints belonged.

Detective Bierbrodt testified that he saw a pizza being prepared and that it could have been the pizza the [Petitioner] ordered. Detective Bierbrodt said that he did not find a burned pizza at the scene, although the [Petitioner] said the victim had reported to the [Petitioner] that the pizza had been burned. Detective Bierbrodt said the surveillance recording showed that the victim only made one pizza from the time the [Petitioner] placed the order until the shooting. Detective Bierbrodt said that he did not interview the bystanders who called the police but that they were interviewed by a detective. Detective Bierbrodt said that he did not ask anyone what role the [Petitioner] played in the incident.

Shelby County Sheriff's Detective Richard Whitaker testified that he analyzed the [Petitioner]'s cell phone. The telephone call log showed that the phone was not used to place calls and did not receive calls between June 9, 2015, and July 14, 2015, and that the most frequent telephone number called from the [Petitioner]'s phone was the number Detective Bierbrodt identified as belonging to Mr. Jones and that the second most frequent contact was labeled "Baby Momma."

On cross-examination, Detective Whitaker testified that the [Petitioner]'s cell phone did not reflect any calls on June 11, 2015, and that the [Petitioner]'s phone was used to call Mr. Jones's cell phone nine times between June 7 and June 9. On redirect examination, Detective Whitaker stated that he did not attempt to retrieve deleted calls and text messages from the [Petitioner]'s phone. Detective Whitaker said that the gap in calls could have been the result of the [Petitioner]'s placing no calls or the result of the [Petitioner]'s erasing the calls. Detective Whitaker stated that his analysis

occurred six months before the trial and that he did not have the technology to determine if calls had been deleted. After reviewing his report, he said that the phone was a "minute phone," or what was known as "a government phone," and that he did not know whether the phone would record calls and text messages if the phone were out of minutes.

Jason Lind, a radio frequency engineer at AT & T, testified that he analyzed June 11, 2015 cell phone tower data of the tower located "just west" of the market. His report showed each cell phone line that utilized the tower, including the date and time that a call was placed. Relative to the telephone number Detective Bierbrodt identified as belonging to Mr. Jones, Mr. Lind identified a six-second outgoing call at 10:21 p.m. to the telephone number Detective Bierbrodt identified as belonging to Mr. Thompson. He identified two additional calls from Mr. Jones's phone to Mr. Thompson's phone from 10:23 to 10:24 p.m. and from 10:28 p.m. to 10:37 p.m.

*State v. Marico Vales*, No. W2018-00424-CCA-R3-CD, 2019 WL 328436, at *1 (Tenn. Crim. App., at Jackson, Jan. 23, 2019), *perm. app. denied* (Tenn. May 20, 2019).

Based upon this evidence, the jury convicted the Defendant as charged. The trial court imposed a life sentence for the felony murder conviction and a concurrent sentence of twenty-five years for the especially aggravated robbery conviction.

## B. Post-Conviction Hearing

The Petitioner filed a post-conviction petition, alleging that Counsel was ineffective. The post-conviction court held a hearing where the only testimony presented was that of the Petitioner's trial attorney ("Counsel"). Counsel testified that he had been practicing criminal defense for twenty-five years and had participated in over 100 jury trials.

Counsel recalled the Petitioner's trial and Shelby County Sheriff's Office Detective Steve Bierbrodt's testimony that referenced the Petitioner's incarceration on unrelated cases. At trial, Detective Bierbrodt testified that he watched video footage from the convenience store, pulled the Petitioner's information and "[f]ound that he was already in jail. [The Petitioner] had gotten arrested a few days prior to them meeting with the girlfriend, and so he pulled [the Petitioner's] booking photo." Detective Bierbrodt also testified that, after identifying the person in the video footage from the convenience store, "We found that he was in jail on unrelated charges and we pulled him up for an interview." Counsel agreed that he did not object to either of Detective Bierbrodt's references to the Petitioner's incarceration on unrelated charges. He further agreed that both comments were

13

"certainly objectionable" but noted that it was questionable whether the comments were "unfairly prejudicial."

Counsel agreed that during closing argument the State referenced Detective Bierbrodt's testimony about the incarceration on unrelated charges. The State's prosecutor stated, "[The Petitioner] is released from custody that Sunday before, according to his statement by Detective Bierbrodt. [The Petitioner] is in custody on unrelated charges." Counsel responded that, although he did not recall that specific statement from closing argument, it was not his practice to object during closing argument. In his experience, making objections during the State's closing invited objections during the defense closing so he refrained from so doing. As a matter of practice, he believed the more appropriate time to object was during the testimony not closing argument. He clarified that he refrained from objecting during closing unless the issue was "very egregious" or a statement he was certain the trial court would sustain. He confirmed that if he had felt the prosecutor's statement was "more egregious" he would have objected.

Counsel recalled Federal Agent Lynn Bracey's testimony regarding an EBT card used to identify the person who ordered a pizza inside the store before the murder. He confirmed that Agent Bracey testified who the card was registered to and the time of its use without the prior introduction of records to lay a foundation for this testimony. Counsel agreed that he did not object to Agent Bracey's testimony, noting that the Petitioner was shown on the surveillance video using an EBT card and he signed the receipt so identity was never an issue. Counsel testified that the issue at trial was what role the Petitioner played in the "botched robbery." The State's theory was that the Petitioner ordered the pizza "to get the [victim] out of the [glassed in area]" where the money was located. Counsel said that the defense theory was that the Petitioner was a regular customer ordering pizza and unaware of the robbery. Counsel said that he chose not to fight the "ID issue" because the Petitioner could clearly be seen on the surveillance video, and he did not want to lose credibility with the jury by challenging identity evidence.

Counsel testified about evidence introduced at trial concerning cell phone usage on the night of the robbery. This evidence showed a connection between the four persons the State alleged committed the robbery and shooting, which included the Petitioner. The police did not have the Petitioner's cell phone, so there was no testimony about the Petitioner's phone; however, there was testimony about a co-defendant's, Antonio Jones, cell phone. Detective Bierbrodt testified about the information found on Mr. Jones's cell phone without the introduction of any business records as foundation. Counsel agreed that he did not object to Detective Bierbrodt's testimony, noting that the defense position was that the Petitioner had nothing to do with the robbery plan and therefore would not have been on the phone calls. Thus, there was no need to object to the testimony. He further

14

noted that cell phone records are routinely admitted at trial and thus the documents would have been admitted anyway.

Counsel testified that the State made a plea offer that was contingent upon the Petitioner testifying against his co-defendants. The Petitioner refused to testify against his co-defendants, so he proceeded to trial. Without the Petitioner's testimony, the State was forced to settle the cases against the Petitioner's co-defendants. Counsel recalled that the Petitioner's co-defendants entered guilty pleas for "far, far, far less sentence[s] than [the Petitioner received]."

On cross-examination, when asked if Detective Bierbrodt's two statements about the Petitioner's incarceration on unrelated charges would have changed the jury's verdict, Counsel responded:

> No. I don't think the jury would have necessarily convicted [the Petitioner] if he was in custody or not in custody when he was being questioned. I think that what doomed [the Petitioner] in the end was he never got this pizza that he ordered. . . . He had said, "I ordered this pizza" and then he never got the pizza. I think if [the Petitioner] had waited and these people came in and committed the robbery, [the Petitioner] could have plausibly said, "I didn't know what was going on", plausibly, but when he leaves seconds before they come in, I think that's, probably, the most damning evidence that there is. I don't think the jury would have found him not guilty if he'd have been brought in from the streets and questioned. I don't find that to be, you know, a tipping point.

Counsel agreed that the reasoning behind his practice of not objecting during closing argument was a professional tactic developed through years of practice and hundreds of jury trials. He did not object to some statements that might be objectionable to avoid drawing the jury's attention to the statement. He clarified, however, that some statements are too egregious and require an objection. Counsel testified that even had he objected to Agent Bracey's testimony about the EBT card, the video clearly showed the Defendant buying the pizza, and the Defendant told the police that he was in the market to buy a pizza for his children.

Counsel testified that the defense theory, that the Petitioner was merely a random customer, had its challenges in that the Petitioner identified the masked shooters.

After hearing this evidence, the post-conviction court issued a written order denying relief as follows:

In this case, Petitioner bases his attacks on his attorney's performance by calling the attorney as a witness, and asking why certain evidentiary objections were not made.

The objections fall into two groups. First, concerning a witnesses' remark that Petitioner was in jail on another charge when his booking photo was obtained by the detective. Trial counsel stated that while it was "some what prejudicial" in his opinion, an objection and possible curative instruction would only act to highlight the matter.

The second area of concern was the process by which the [S]tate demonstrated that the EBT card used moments before the killing led to its owner telling the police that Petitioner was using it. The defense strategy in this case was not to dispute Petitioner's presence (he is seen on video) and so the process by which he was identified was not detrimental to their strategy.

As with most trials, a leisurely review of the testimony that took place in regular time and speed reveals instances where an objection might have been made and sustained.

In this case, [C]ounsel was well-prepared for trial with the only viable strategy available to him. The fact that the jury rejected the defense theory and accredited the State's version of events does not automatically render the assistance deficient.

In this case, the errors, if they were errors, simply did not prejudice the Petitioner's defense.

It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner maintains that Counsel was ineffective because Counsel: (1) failed to object to unfairly prejudicial references that he was in jail on unrelated charges at the time of police questioning in violation of Rule 404(b); and (2) failed to object to cell phone and photographic evidence that lacked a foundation. The State responds that the post-conviction court properly denied the Petitioner relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional

16

right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

17

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### A. 404(b) Evidence

The Petitioner asserts that Counsel was ineffective when he failed to object to Detective Bierbrodt's testimony referencing the Petitioner's incarceration on unrelated charges and for not objecting to the same evidence when the state referenced the incarceration during closing argument. The State responds that the Petitioner failed to meet his burden of showing, by clear and convincing evidence, that Counsel was deficient in this respect and that he was prejudiced by the alleged deficiency. We agree with the State.

At trial, Detective Bierbrodt testified about the progression of his investigation of the robbery and shooting. Specifically, Detective Bierbrodt testified that he watched video

footage from the convenience store, pulled the Petitioner's information, and "[f]ound that he was already in jail. [The Petitioner] had gotten arrested a few days prior to them meeting with the girlfriend, and so he pulled [the Petitioner's] booking photo." Still discussing the progression of the investigation, the State asked, "Once you have identified this person in the video was [the Petitioner], what did you do next?" Detective Bierbrodt responded, "We found that he was in jail on unrelated charges and we pulled him up for an interview." Trial counsel did not object to this testimony. The State also referenced "unrelated charges" in closing argument without objection.

The Petitioner argues that because the reference to his prior incarceration was evidence of prior bad acts under Tennessee Rule of Evidence 404(b), this testimony was not admissible. Regardless of the admissibility of the testimony, we conclude that the Petitioner has not shown prejudice.

The statements were unsolicited and part of Detective Bierbrodt's testimony about the development of the investigation that led to the Defendant's statement to the police. *See State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). Identification was not at issue as testified to by Counsel and confirmed by the trial court. The State's proof against the Defendant was relatively strong. *Id*. The proof at trial was that the Defendant ordered a pizza requiring the victim to leave the cash register area to make the pizza. The Defendant, without waiting for his pizza, left the market and his two co-defendants entered, took cash from the cash register, and then shot the victim. The Defendant never returned for the pizza he ordered. Thereafter, the Defendant identified his co-defendants who were masked at the time of the robbery. The Petitioner has not established a reasonable probability that, had Counsel objected based on these brief references to his incarceration, the outcome of the trial would have been different.

Moreover, Counsel testified that Detective Bierbrodt's two references were possibly objectionable but expressed some doubt on whether such minor references would be considered "unfairly prejudicial." Counsel discussed his theory on objections, saying he refrained from objections where possible so as not to invite such interruptions during his closing argument and questioning. He also acknowledged concern that an objection can draw a jury's attention to testimony as well as objections can unnecessarily distract jurors. As earlier stated, "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

Accordingly, we conclude that the Petitioner failed to prove by clear and convincing evidence that Counsel was deficient in this respect and that the alleged deficiency prejudiced the Petitioner. The Petitioner is not entitled to relief as to this issue.

## B. Phone Records

The Petitioner asserts that Counsel's failure to object to a lack of foundation for the introduction of cell phone evidence introduced through Detective Bierbrodt constitutes ineffective representation. The State responds that the Petitioner has failed to meet his burden with respect to this allegation. We agree with the State.

The Petitioner's cell phone was not in use during the period in question and therefore the records were not introduced at trial. When questioned about the co-defendant's phone records that were introduced through Detective Bierbrodt, Counsel stated that the defense theory was that the Petitioner was not involved; therefore, the records would bear out no communication between Antonio Jones and the Petitioner. Because of this, Counsel did not think it necessary to object.

The record reflects that Counsel's decision to not object to the records was strategic and a tactical choice based upon his experience. *See House*, 44 S.W.3d at 515. Even assuming that this was error, we cannot conclude that it was error "so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment. Neither has the Petitioner shown that this alleged error was of such a nature that it deprived him of a fair trial and undermined confidence in the outcome. Therefore, the Petitioner is not entitled to relief as to this issue.

## III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

20